ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY - 8 2012

CLERK, U.S. DISTRICT COURT
By _____
            Deputy

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| IN RE: § | |
| § | Bankruptcy Case No. |
| REOSTAR ENERGY CORPORATION, § | 10-47176-dml-11 (as |
| ET AL., § | consolidated for Joint |
| § | Administration with |
| Debtors. § | Bankruptcy Case Nos. |
| § | 10-47198; 10-47201; |
| ——————————————— § | and 10-47203) |
| § | |
| REOSTAR ENERGY CORPORATION, § | |
| REOSTAR GATHERING, INC., § | |
| REOSTAR LEASING, INC., AND § | |
| REOSTAR OPERATING, INC., § | |
| § | |
| Plaintiffs, § | Adversary No. 11-4022-dml [Closed] |
| § | |
| VS. § | |
| § | District Court Case No. |
| BT AND MK ENERGY AND § | No. 4:12-CV-046-A |
| COMMODITIES, LLC, § | |
| BANCTRUST & CO., BANCTRUST § | |
| INTERNATIONAL, INC., § | |
| CHRISTIAN LOVERA, CARLOS § | |
| FUENMAYOR, MARK ZOUVAS, § | |
| AND SCOTT ALLEN § | |
| § | |
| Defendants. § | |

### THIRD AMENDED COMPLAINT AND
### REQUEST FOR DECLARATORY JUDGMENT RELIEF

TO THE HONORABLE JOHN MCBRYDE,
UNITED STATES DISTRICT COURT JUDGE:

REOSTAR ENERGY CORPORATION, REOSTAR GATHERING, INC., REOSTAR

LEASING, INC., AND REOSTAR OPERATING, INC. (collectively "**ReoStar**" or "**Plaintiffs**")

complain of Defendants BT AND MK ENERGY AND COMMODITIES LLC ("**BTMK**"),

BANCTRUST & CO. ("**BT**"), BANCTRUST INTERNATIONAL, INC. ("**BT International**"),

CHRISTIAN LOVERA ("**Lovera**"), CARLOS FUENMAYOR ("**Fuenmayor**"), MARK

ZOUVAS ("**Zouvas**"), and SCOTT ALLEN ("**Allen**"), (unless otherwise noted, BTMK, BT, BT International, Lovera, Fuenmayor, Zouvas, and Allen are collectively referred to herein as "**Defendants**").

## I. PARTIES

1.      ReoStar Energy Corporation is a Debtor-In-Possession in the above-styled and referenced jointly administered bankruptcy cases (collectively, the "**Case**"). ReoStar Energy is a Nevada corporation and, along with the other Debtors, is involved in oil and gas recovery in Texas. *In re ReoStar Energy Corporation*, Case No. 10-47176 ("**ReoStar Energy**").

2.      ReoStar Gathering, Inc. is a Debtor-In-Possession in the above-styled and referenced jointly administered bankruptcy cases (collectively, the "**Case**"). ReoStar Gathering, Inc. is a Texas corporation and, along with the other Debtors, is involved in oil and gas recovery in Texas. *In re ReoStar Gathering, Inc.*, Case No. 10-7198 ("**ReoStar Gathering**").

3.      ReoStar Leasing, Inc. is a Debtor-In-Possession in the above-styled and referenced jointly administered bankruptcy cases (collectively, the "**Case**"). ReoStar Leasing, Inc. is a Texas corporation and, along with the other Debtors, is involved in oil and gas recovery in Texas. *In re ReoStar Leasing, Inc.*, Case No. 10-7201 ("**ReoStar Leasing**").

4.      ReoStar Operating, Inc. is a Debtor-In-Possession in the above-styled and referenced jointly administered bankruptcy cases (collectively, the "**Case**"). ReoStar Operating, Inc. is a Texas corporation and, along with the other Debtors, is involved in oil and gas recovery in Texas. *In re ReoStar Operating, Inc.*, Case No. 10-7203 ("**ReoStar Operating**")

5.      BTMK is a Delaware limited liability company formed on January 8, 2010 that did business in the State of Texas and may be served with a copy of this Amended Complaint through its counsel of record.

**THIRD AMENDED COMPLAINT**
**AND REQUEST FOR DECLARATORY JUDGMENT RELIEF**                                            **- Page 2**

6.      ReoStar has been unable to locate an entity by the name of BancTrust & Co. which was or has been formed in the United States. It does not appear that it has been registered to do business in the State of Texas or any other State in the United States. Recent contact information provided by Lovera, with whom ReoStar dealt on behalf of BT and BT International, and where BT and BT International may be served with Summons and a copy of this Amended Complaint, is 1221 Brickell Avenue, Suite 931, Miami, FL 33131, and/or through its counsel of record.

7.      ReoStar has been unable to locate an entity by the name of BancTrust International, Inc. which was or has been formed in the United States. It does not appear that it has been registered to do business in the State of Texas or any other State in the United States. ReoStar has never been provided a specific mailing address for BT International. BT International, through its CEO Fuenmayor, signed the term sheets which are discussed below. BT International, through its CEO Fuenmayor, signed the Line of Credit assignment from Union Bank which is discussed below. On information and belief, BT International may be served with Summons and a copy of this Amended Complaint by serving its officer Lovera, with whom ReoStar dealt on behalf of BT and BT International, at 1221 Brickell Avenue, Suite 931, Miami, FL 33131, and/or through its counsel of record.

8.      Lovera is the Executive Vice President of BT, where he has been employed since at least 2005. In addition to other simultaneous officer positions at BT, Lovera is also an officer of BT International. Lovera provided ReoStar with his address in the United States, at which he may be served with Summons and a copy of this Amended Complaint, at 1221 Brickell Avenue, Suite 931, Miami, FL 33131, and/or through his counsel of record. His last known domestic home address is 265 West Heather Drive, Key Biscayne, FL 33149.

9.      Fuenmayor is the Chairman, Chief Executive Officer, and Founder of BancTrust & Co, where he has been employed since at least 2003. Fuenmayor is also the Chief Executive Officer of BT International, Inc. Fuenmayor may be served with Summons and a copy of this Amended Complaint at BT and/or BT International's business address, at 1221 Brickell Avenue, Suite 931, Miami, FL 33131, and/or through his counsel of record.

10.     Zouvas has entered an appearance in this action and may be served with a copy of this Amended Complaint through his counsel of record, or at his last known home address, 2959 Magnolia Hill Court, Dallas, TX 75201.

11.     Allen is an individual residing in the State of Texas. He may be served with Summons and a copy of this Amended Complaint through his counsel of record, or at his last known home address, 7444 Candler Drive, Fort Worth, TX 76131.

## II. JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

13.     This is a core proceeding under 28 U.S.C. § 157(b)(2) (A), (B), (C), (D), (E), (F), (H), (K), and (O).

14.     Venue of this action is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. FACTS

### A. FORMATION OF REOSTAR

15.     ReoStar is an oil and gas company incorporated on November 29, 2004 under the laws of the State of Nevada under the name Goldrange Resources, Inc. Effective February 1, 2007, the company changed its name to ReoStar Energy Corporation, after three entities (JMT

Resources, Ltd., a Texas limited partnership (JMT), REO Energy, LTD., a Texas limited partnership (REO), and BENCO Operating, Inc., a Texas corporation (BENCO) (JMT, REO and BENCO, are collectively referred to as Contributors)) contributed certain assets to Goldrange Resources, Inc. (**"Goldrange"**) in exchange for stock. The Contributors were under common control prior to the transaction, and immediately after the transactions, the former shareholders of the Contributors owned 80.4% of the issued and outstanding stock of Goldrange.

16. In connection with the transaction, the Company agreed to appoint the following new directors and executive officers: M.O. Rife III, as Chairman of the Board of Directors; Mark S. Zouvas, Chief Executive Officer, President and Director; Jon B. "Brett" Bennett, Vice President and Director; Jean-Baptiste Heinzer, Director; and, Alan Rae, Director. Scott Allen was elected to serve as the Chief Financial Officer of ReoStar.

17. At all relevant times during the events described herein, Zouvas acted as the Chief Executive Officer, President and Director of ReoStar. At all relevant times during the events described herein, Allen acted as the Chief Financial Officer of ReoStar.

18. ReoStar has at all times been engaged in the exploration, development and acquisition of oil and gas properties, primarily located in the state of Texas, and has continually sought to increase oil and gas reserves and production through internally generated drilling projects on currently owned assets, coupled with complementary acquisitions. At year-end 2010, ReoStar owned approximately 9,000 acres of leasehold, which included 5,000 acres of exploratory and developmental prospects as well as 4,000 acres of enhanced oil recovery prospects. ReoStar had built a multi-year inventory of drilling projects and drilling locations with enough acreage to sustain several years of drilling. Its principal place of business has always been located in Fort Worth, Texas.

## B.  UNION BANK LINE OF CREDIT

19.    In October 30, 2008, ReoStar executed a Credit Agreement for a senior credit facility ("**Line of Credit**") with Union Bank of California, N.A. ("**Union Bank**"), with ReoStar as the "Borrower," and ReoStar Gathering, ReoStar Operating and ReoStar Leasing as "Guarantors." The Line of Credit enabled ReoStar, with borrowing base compliance, to borrow up to $25 million to finance drilling operations on its Barnett Shale properties and under its Corsicana leases. Pursuant to the terms of the senior credit facility, the initial borrowing base was set at $14 million and was subject to re-determination every six months with one optional re-determination allowed between scheduled re-determinations.  The credit facility was secured by all of the Company's assets and was senior to all other long-term debt. The outstanding principal was due October 30, 2011.

20.    ReoStar initially took advances under the Line of Credit of approximately $8 million, and ultimately borrowed up to $10.8 million.   In late 2008 and into 2009, the market price of oil and natural gas sharply declined.  As a result, sometime between April and June of 2009, Union Bank froze ReoStar's Line of Credit, due to ReoStar's inability to maintain certain financial covenants under the Line of Credit.   However, ReoStar was cash flow positive and continued making its monthly interest payments to Union Bank.  Union Bank did not indicate that these non-monetary defaults would trigger immediate acceleration or that it desired to foreclose, and at all times continued to work with ReoStar, accepting payments on the Line of Credit.  In fact, Union Bank was willing to allow ReoStar necessary leeway in order to allow the oil and gas market and ReoStar's business to improve, so that the financial covenants under the loan could be met.  As such, ReoStar desired a needed injection of capital and began to search for potential investors.

21.    As late as October 2009, ReoStar was still current on its payments to Union Bank, and had not received a notice of default or acceleration of the Line of Credit, but was still out of compliance.

22.    On October 19, 2009, Zouvas made an offer to ReoStar's majority shareholders to provide ReoStar with financing for a majority stake in the company.

23.    On or around October 2009, a Venezuelan group headed by Carlos Fuenmayor and Christian Lovera became involved in these matters. At all relevant times discussed below, BT, BT International, and/or other intermingled and affiliated BT entities controlled by Fuenmayor and lead by Lovera, executed documents and signed correspondence in dealing with ReoStar or related parties. To date, ReoStar has dealt with, and discovered no less than, seven Fuenmayor and Lovera related entities, including BancTrust & Co., BancTrust International, Inc., BT Energy and Commodities, LLC, BT Energy and Commodities, Inc., BT Energy and Commodities Holdings, Inc., BT Capital Markets LLC, and BancTrust & Co. Holding C.V. At all relevant times, Fuenmayor was the head of BT, BT International (as well as the above-mentioned BT entities), and Lovera acted under Fuenmayor's direction in perpetrating fraud against ReoStar.

24.    On October 20, 2009, BT Energy and Commodities, LLC was formed as a Venezuelan company. *See* receivership action styled *Securities and Exchange Commission v. Francisco Illarramendi and Michael Kenwood Capital Management, LLC*, pending in the United States District Court for the District of Connecticut, Civil Action No. 3:11-cv-00078-JBA (the "**Receivership**"), **Doc. No. 285**.

25.    In November 2009, BT, through Cesar Jiminez, its Director of Oil & Gas, executed a Confidentiality and Non-Circumvention Agreement (CNDA) with Niton Capital

Partners, S.A. ("**Niton**"), a sub-broker brought in by Oliver Janssens ("**Janssens**") of Standard Atlantic, S.A. The CNDA provided that Niton would provide confidential information about ReoStar to BT for the exclusive purpose of "evaluating potential business relationships and opportunities with [ReoStar]." ReoStar was searching for capital investment in the company, and as such, required Niton to provide confidential information only to parties willing to agree to this stipulation in the form of a CNDA.

26.     On approximately December 10 – 11, 2009, Niton proceeded to bring in this Venezuelan group and traveled to the Dallas/Fort Worth metroplex in order to conduct a first look and review ReoStar's assets.

27.     On January 3, 2010, after nothing transpired as a result of Zouvas's October 19th offer, the majority shareholders of ReoStar conveyed to Zouvas that they were no longer interested in his proposal, and wanted Janssens and others to focus instead on new capitalization opportunities from third parties.

28.     On January 8, 2010, BT Energy and Commodities, Inc., a Delaware corporation founded by Fuenmayor, was converted from a corporation to a limited liability company by the execution and filing of a Certificate of Conversion of BT Energy and Commodities, Inc., with the Delaware Secretary of State. Upon conversion, the entity was renamed BTMK, formed via conversion, as a Delaware limited liability company between BT International and Michael Kenwood Asset Management, LLC ("**MK Asset Management**"), with each holding a fifty percent (50%) membership interest.

### C. SEARCH FOR RECAPITALIZATION PARTNERS TURNS TO FRAUD

29.     In connection with its search for new capital, ReoStar worked with several groups known to the Board, including Janssens with Standard Atlantic; Alain Vignon ("**Vignon**") of

Niton Capital Partners, S.A.; and Grant Swartzwelder ("**Swartzwelder**") with PetroGrowth Energy Advisors, LLC ("**PetroGrowth**"). Since the CNDA executed by BT and Niton (on behalf of ReoStar) was in place to limit access of confidential information to capital investors only, Vignon of Niton introduced ReoStar to BT.

30.     On February 4, 2010, BT, through its officer Lovera, contacted ReoStar through Niton and made a proposal for "a majority interest in" ReoStar, *but desired immediate contact with Union Bank.* Notwithstanding the fact no address was provided for BT, ReoStar proceeded to respond to BT's offer for a capital infusion or possible acquisition of ReoStar equity.

31.     ReoStar responded to this proposal on March 4, 2010 to Lovera. ReoStar understood that, under the proposal, BT was to provide ReoStar with at least $10 million of much needed capital "to develop its reserves," but BT continued to desire immediate contact with Union Bank prior to a letter of intent or term sheet being presented. BT and/or BT International began its due diligence examination of ReoStar's financial and business books and records. No due diligence, however, was done as to BT, nor was required by Zouvas or Allen, before BT and/or BT International was allowed unfettered access to ReoStar's proprietary and confidential business and operational information.

32.     If due diligence had been performed by Zouvas or Allen, they would have discovered that on or about August 5, 2005, after termination of Lovera's employment, Lovera's prior employer, Merrill Lynch, filed an Amended Uniform Termination Notice for Securities Industry Registration ("**Form U-5A**") with NYSE Regulation, Inc.'s Division of Enforcement ("**Enforcement**"), which reported a pending customer complaint alleging Lovera engaged in misappropriation of funds and forgery. Lovera's client alleged damages and fees of over $100,000 and the suit was settled by Merrill Lynch for approximately $103,000. A Hearing Officer on behalf

of the New York Stock Exchange LLC ("**NYSE**") considered a Charge Memorandum issued by Enforcement charging Lovera with having violated NYSE Rules 476(a)(11) and 477 by failing to comply with one or more written requests by the NYSE for information regarding activities that occurred during his employment at a member firm. The Hearing Officer found Respondent guilty, and, by order dated May 30, 2007, the Hearing Officer granted the Motion. The Hearing Officer imposed the penalty of a censure and a permanent bar from membership, allied membership, approved person status, and from employment or association in any capacity with any member or member organization. The decision became final as of close of business on June 25, 2007, with the bar against Lovera becoming effective as of the close of business on June 29, 2007.

33.    In an email dated March 16, 2010, from Janssens to ReoStar, ReoStar was advised that a "team" from BT would arrive on March 22, 2010, to conduct due diligence with respect to the proposal to become an equity investor in ReoStar.[1]

34.    Just prior to the arrival of the BT and/or BT International due diligence "team," on March 11, 2010, Zouvas as sole manager and John Calce ("**Calce**") as organizer formed Magnolia Hill Resources, LLC ("**MHR**"), a Texas limited liability company. Upon information and belief, the corporate purpose of MHR was to funnel the capital injection from BTMK to ReoStar through it, and funnel other deals for corporate restructuring and recapitalizing opportunities with BT (and/or BT International, MK Capital, or BTMK) for the personal benefit and gain of Zouvas. Also, just prior to the arrival of the BT due diligence team, by email communication received from Jimenez of BT dated March 17, 2010, ReoStar was advised that

---

[1]    None of the individuals included in the "team" were indicated to have any affiliation with the MK Group or any of the Receivership Parties.

BT was partnering with Kenwood Capital and they wanted contact with ReoStar. The Kenwood Capital contacts were Thomas Lionelli ("**Lionelli**") and Ronald Percival ("**Percival**").

35.    The BT team arrived at ReoStar and began its due diligence on or around March 22, 2010. BT conducted extensive due diligence at ReoStar's headquarters. BT representatives were given full access to proprietary and confidential information about ReoStar's gas reserves and business plans involving production by ReoStar by Zouvas, Allen and ReoStar's corporate and securities counsel Ray Lee ("**Lee**") of Greenberg Traurig, LLP ("**GT**").

36.    On March 23, 2010, Allen introduced Percival and Lionelli, who represented themselves to be acting on behalf of MK Capital, to Union Bank. On March 29, 2010, Allen, with knowledge that no CNDA or background check on MK Capital existed, executed a *Release and Hold Harmless Agreement* ("**Release**") on behalf of ReoStar allowing MK Capital to speak directly with Union Bank concerning "a financial transaction between it and Michael Kenwood Capital Management." This document allowed MK Capital to conduct due diligence in evaluating a financial transaction with ReoStar, at a time when no term sheet or letter of intent had been provided or approved by the Board.

37.    Due to the magnitude of the deal proposed, BTMK also was well aware that brokers were involved, and would likely continue to be involved, with significant commissions due or requested. BT themselves had signed a CNDA agreement with a broker in connection with, and prior to, reviewing ReoStar's confidential information. In separate discussions with Lovera and Cesar Jiminez ("**Jiminez**") of BT, Zouvas spoke of the maneuvering of the brokers in the deal, including Niton, Janssens, Vignon, etc. In addition to their actual knowledge of brokers, Lionelli and others at BTMK were experienced and sophisticated business persons that would, in their business experience, know that brokers were involved in the proposed

transactions. Nonetheless, BTMK would use the existence of brokers as one of two pretextual excuses to go back on BTMK's promises. (The other excuse would prove to be an impossible condition that BTMK knew would not be met).

38. During the fiscal year ended March 31, 2010, the borrowing base was adjusted downward to $7.6 million leaving an over-advance of $3.2 million. It was reported that "the Company lacked the liquidity to repay the over-advance," however, in December, 2009, Zouvas reached a compromise with a creditor and obtained a payoff on a sizeable note owed to ReoStar. Zouvas instructed Allen to hide the transaction from the ReoStar board. With Allen's assistance, Zouvas then made undisclosed and unauthorized transfers to insiders, including Calce and Zouvas's father, rather than using the money to benefit ReoStar's financial situation, at a time when it was insolvent. It is unknown whether other similar transactions occurred and went unreported. To wit, ReoStar was paid $450,000.00 on December 22, 2009 and Zouvas subsequently wired Mr. Peter Zouvas $203,682.19 (with 56 days of interest) on December 24, 2009. On information and belief, Zouvas also arranged for a payment of $30,000 to be made to Three Bar C, Inc. for services rendered on the transaction; Three Bar C is owned by Calce.

39. At all relevant times, the primary negotiators in discussions on the so-called recapitalization with BTMK were Zouvas, Allen, Lovera (with BT's CEO Fuenmayor copied on all correspondence), Percival, and Lionelli.

40. On April 20, 2010, MK Oil Ventures, LLC ("**MK Oil**"), was formed as a Delaware limited liability company. MK Oil was another Michael Kenwood related entity, and a Receivership Party, formed on information and belief, to later enable BTMK to purchase the Union Bank Line of Credit with misappropriated funds and as a result of a fraudulently

perpetrated scheme upon the investors in the Michael Kenwood entities, as well as the Reostar investors and creditors.

41.     Following execution of the Release, and shortly after formation of MK Oil, specifically around May 3, 2010, Lionelli and Percival engaged in private, undisclosed discussions with Mark Zouvas and Union Bank regarding acquisition of the Line of Credit. Representatives with MK Capital continued to conduct extensive due diligence at ReoStar's headquarters.  These representatives were not only allowed to have private discussions with Union Bank, but were given access to proprietary and confidential information about ReoStar's gas reserves and business plans involving production, without a term sheet or letter of intent.

42.     ReoStar's Board was told that BT and MK Capital were partnering to make a substantial investment in ReoStar that would allow it to continue drilling operations and future development by providing a capital injection and retiring the Union Bank Line of Credit.  While the Board understood, as a part of this process, BT and MK Capital would need to negotiate with Union Bank regarding retiring the Line of Credit, the ReoStar Board did not know BT and MK Capital, acting through the Defendants to this action and in concert with themselves, were working against ReoStar's interests, to instead acquire the Union Bank Line of Credit at a deep discount (over 50%) and immediately foreclose on consensual liens to gain control of ReoStar's assets.

43.     BT International (and/or BT) and MK Capital (and, on information and belief, BTMK thereafter) at all relevant times continued to represent when appropriate to allow full access, that it was interested in investing in its business and acquiring the Line of Credit for such purposes, only so that it could continue to gain valuable proprietary and confidential information about ReoStar's value as a going concern.

**THIRD AMENDED COMPLAINT**
**AND REQUEST FOR DECLARATORY JUDGMENT RELIEF**                                      **- Page 13**

44.     It was unknown to ReoStar's Board at this time that Zouvas, BTMK, BT and/or BT International, all named Defendants herein, were acting in their own self-interests to usurp and take advantage of corporate opportunities of and from ReoStar by refusing to investigate any alternatives to the supposed investment by BTMK and using information gained under the guise of misrepresentations that it would be investing in ReoStar to save the company, rather than steal its assets. On May 14, 2010, ReoStar received a letter from BTMK informing ReoStar of "BTMK's" continued interest "involving the Acquisition of the Notes, Shares or a Combination of the Notes and Shares of ReoStar Energy Corporation." This was the first time ReoStar became aware of the existence of BTMK.

45.     On May 18, 2010, MK Oil replaced MK Asset Management as the other 50% member of BTMK. ReoStar was not aware of this fact at the time of the transaction at issue in this action. ReoStar later learned that BTMK was initially incorporated as BT Energy and Commodities, Inc. on October 20, 2009 and converted to BT and MK Energy & Commodities, LLC on January 8, 2010. BT International and MK Asset Management, rather than MK Capital, are shown to be the original members of BTMK. MK Oil was not formed until April 10, 2010 and was the party that executed the documents associated with the transfer of the Line of Credit from Union Bank to BTMK. ReoStar had no known non-disclosure agreement or other agreement authorizing any Michael Kenwood Group, including MK Oil to access confidential and/or proprietary business and/or financial information relating to ReoStar, despite its understandings otherwise from Defendants Zouvas, Allen, and others.

46.     MK Capital, Kenwood Group, MK Oil, BT, BT International and/or BTMK, acting unilaterally and/or, upon information and belief, in concert, and with the active participation of the individual Defendants to this action, through the commission of a fraudulent

scheme on ReoStar, negotiated with Union Bank to acquire the Line of Credit obligation at a significantly deep discount, then failed and refused to provide the promised capital, forcing ReoStar into default and immediately set the collateral securing the Line of Credit for foreclosure.

47.     In fact, BTMK began circulating "Term Sheets" (referred to herein as "Letter of Intent" or "**LOI**") which discussed an injection of resources, payment of subordinate debt, and other deal points that were of significant benefit to ReoStar in late April/early May. The LOIs are signed by BT International, rather than BTMK. It subsequently became clear that BTMK never intended to close the LOI. Despite the intent never to close, BTMK used the negotiation of the LOI to continue to lead ReoStar to believe it was a genuine investor with proper motives.

48.     On June 15, 2010, ReoStar executed an engagement letter with PetroGrowth. Swartzwelder immediately began to act on PetroGrowth's behalf in locating competitive offers and financing alternatives for the recapitalization of ReoStar. Swartzwelder requested engineer reports, marketing information and financial data, which was not readily, if ever, provided by Zouvas or Allen. Swartzwelder had an established relationship with Union Bank and was the broker that originally worked with ReoStar in obtaining the Union Bank Line of Credit in October of 2008. As such, ReoStar's Board believed that he was in the best position to work out an agreement with Union Bank.

49.     That same day, on June 15, 2010, while Swartzwelder attempted to locate financing alternatives for ReoStar, BTMK discussed a private deal to work with Zouvas directly for their benefit, in lieu of closing the deal being negotiated with ReoStar.

50.     Two days later on June 17, 2010, Swartzwelder had already met with several groups to discuss their interest level in ReoStar, and requested to be present at an upcoming

meeting with Union Bank.  Zouvas and Allen, through a series of emails, cut Swartzwelder out of that meeting, and made up untruthful explanations and excuses about why his presence was not timely or appropriate.  Zouvas and Allen admit to be "stonewalling" Swartzwelder in an email dated June 18, 2010.  Unknown to ReoStar's Board, Zouvas emailed Lionelli and Percival just days earlier on June 16, 2010 requesting that BTMK work with Zouvas directly "to move forward together in a different direction."

51.     On June 22, 2010, Zouvas and Allen held a meeting at ReoStar's Fort Worth office with Timothy Hintz ("**Hintz**") of Union Bank and "made clear that it had no other viable options to raise cash" … "other than an investment from a joint venture formed by Michael Kenwood Group and BancTrust International, Inc., called BT & MK Energy Commodities, LLC ('BT&MK')."  This clearly was not the case.

52.     On June 24, 2010, Zouvas stated in an email to Lee, in response to a previous email from Swartzwelder, that retaining Swartzwelder was a "stroke" because, due in large part to Zouvas's and Allen's obstruction of the process, "he has nothing."  Zouvas went on to use vulgarities and make threats to harm the ReoStar Board, and further made clear that making the June 30th interest payment to Union Bank was absurd.  Allen withheld critical information and failed to ever disclose any of the harmful emails from Zouvas to ReoStar's Board.

53.     In June 2010, Zouvas and Allen stopped making the monthly interest payment to Union Bank, exacerbating the pressure on Union Bank's work-out team and increasing the likelihood that a deep discount could be negotiated for the benefit of Defendants.

54.     On July 5, 2010, Zouvas told Allen in an email "I don't think we want to say anything to anyone about Union's response to MKBT – we need to get them into an agreement quick and *not give the other team a deadline to get a competing offer* – we can always turn

around and sell to them and their 'group' for more dollars" (emphasis added).  In fact, Allen

never did "say anything to anyone," despite his fiduciary duty to act in the best interests of the

company and its shareholders and creditors.

55.    In the meantime, Swartzwelder continued to seek proposals, but was careful not to

allow any interested third parties to discuss their interest in ReoStar directly with Union Bank,

"until an acceptable deal had been reached with the company" – unlike Zouvas and Allen.

Swartzwelder stated to Zouvas and Allen on a number of occasions that having debt purchased

without understanding what could happen to the entity was one of his big concerns.

56.    On July 8, 2010, Swartzwelder again emailed Zouvas and Allen to request a

dialogue with Hintz of Union Bank, and due to the continual delay tactics of Zouvas and Allen,

specifically requested he be allowed to speak with Union Bank by the following day.  In an email

response to Swartzwelder from Zouvas on July 8, 2010 at 8:00 p.m., Zouvas stated "We have

been trading phone calls with Tim at Union and hope to touch base with him soon -- ... I do not

think it would be appropriate to have you reach out to him without us first understanding the

bank's current position on several issues and more importantly, us introducing you into the

situation.  With respect to the request or need to speak with them by tomorrow, I think we need

to have a chat so I can understand the urgency of the matter; we can then decide which route to

pursue in the best interests of the Company."

57.    Despite this communication, on July 9, 2010, Zouvas reinforced in a message to

Hintz that ReoStar had "no other immediate or viable options to raise cash" other than the

investment from the BTMK joint venture.   Shortly thereafter, Lionelli emailed the other

members of BTMK on July 21, 2010 where he stated BTMK would share profits with "Mark and

co" after buying the Note at a discount from Union Bank and flipping the Barnet Shale assets for $9 million.

58.    While Swartzwelder continued to try and obtain previously requested company information so he could produce a cogent package for investors and implement a comprehensive marketing strategy of the opportunities associated with ReoStar, his efforts were negatively impacted by Zouvas, Allen, and BTMK. Simultaneous to Swartzwelder's ongoing efforts, and unbeknownst to ReoStar, Lionelli, on behalf of BTMK, was negotiating directly with Hintz. Hintz advised Lionelli in an email dated July 23, 2010, that the "details of their arrangement should not be disclosed" to Reostar.

59.    In an email dated Sunday, July 25, 2010, at 7:23 p.m., Zouvas disclosed to Lee that BTMK had withdrawn all offers to ReoStar and advised that all the amounts due under the credit facility were due to BTMK and that BTMK planned to proceed with foreclosure of ReoStar's assets. Zouvas directed Calce to "get the offer from EOG and present [it] directly to BTMK." This information was never shared with ReoStar's Board by any of the Defendants.

60.    In an email to Lee on July 25, 2010, Zouvas set forth a potential structure involving JMT and/or MHR whereby Zouvas and related others would secretly benefit from the BTMK transaction with ReoStar, and explained to Lee that he wanted to "push this structure with Trey [Rife]." Neither this email nor its content was ever disclosed to Rife or ReoStar's Board.

61.    In communications on July 26, 2010, concerning the timing of the closing of the loan purchase, Lionelli learned from Union Bank representatives that it would need to post for a September foreclosure no later than August 17, 2010, and as such, the closing of the purchase of the credit facility should not go past August 13, 2010.

62.     In emails dated July 28, 2010, between Swartzwelder and Zouvas (copying the ReoStar Board members and others), Swartzwelder expressed his concerns that (i) BTMK may have a deal with Union Bank before reaching terms with the Company, and (ii) if BTMK has reached a deal with Union Bank, (a) the Company has more than likely lost all leverage with BTMK and (b) the Company will not be able to get another group to fully engage in the process. On July 29, 2010, Zouvas responded in an email by stating numerous times that "in every offer submission, their [BTMK's] language clearly, and unequivocally states the offer is *contingent on reaching a deal with REOS* – it is not their intent to acquire highly specific assets in a complex area under a distressed scenario, quite the opposite, their intent and overall business plan is to establish an operating platform and build a company with assets that can benefit from their extensive G&G experience." (emphasis added).

63.     On July 31, 2010, Lovera emailed BTMK stating that he was "not in the mood to negotiate any more... we could just buy the loan and put them into bankruptcy and take the assets with no negotiation."   Plaintiffs allege that this is the very course of action BTMK conspired to perpetrate against the Plaintiffs from the beginning.

64.     Thereafter, on August 3, 2010, Zouvas and Allen went to secretly meet with BTMK. Zouvas e-mailed Allen on August 3, 2010 at 7:04 a.m. instructing Allen to assist him in perpetration of the fraud and breaches of duty: "I am supposed to have a conference call with JBB [Joe Bill Bennett ("**Bennett**"), a manager of a major shareholder of ReoStar and party to the LOI] and Trey [M.O. Rife III ("**Rife**"), Chairman of the Board and a party to the LOI] at 10 this morning.  No one is to know we are leaving today. ... See you at the airport around 11."

65.     In another arrangement unknown to ReoStar's Board, Zouvas tried to recharacterize Calce's broker/advisor fee into a "payable" to get Calce paid when it was clear on

the term sheet that brokers and advisors would not be paid, as seen on the email exchange of August 12, 2010 between Lee to Zouvas stating: "I don['] t give a s*** how much cal[c]e gets or how much O doesn['] t get – i am trying to protect you from the heat. The term sheet clearly states that BTMK will not pay any broker, advisor or othe[r] fees to Niton, Tritaurian or anyone else."; and Zouvas's response to Lee: "They are not going to, but they have approved John's payable – why is that so hard to understand?"

66.     BTMK confirms this private arrangement in their internal email correspondence on September 20, 2010 at 7:18 A.M. from Lionelli to MK boss Illarramendi, Percival, and other MK executives stating: "We plan to hire John Calce to help us sell the Barnett Shale leases... John will be paid a success fee of 3.5% (minimum of $100,000) if a sale is completed. In addition, we had previously agreed that he is owed $165,000 by ReoStar for prior consulting work." Zouvas did not disclose this quarter-million dollar "payable" arrangement to ReoStar's Board. Lionelli goes on to give details of a meeting taking place that week: "Both John [Calce] and Mark Zouvas, ReoStar's CEO, will be in our Stamford office on Friday. They are returning from a meeting in London with some of the larger shareholders." The ReoStar Board was neither informed nor made aware of this meeting.

67.     August 13 and 14, 2010 email correspondence from Lionelli to Timothy Spear, BTMK's counsel at Gardere, confirms BTMK knew they were "entering unchartered and possibly hostile waters" and had *no intention* of obtaining 95% approval as "this is almost impossible to accomplish" and "Even if it does, BTMK has reserved the right to insist on 100% consent" (to further ensure they would not have to actually capitalize ReoStar as promised), and yet, ten days later, BTMK elicited an August 23, 2010 term sheet knowing they would not obtain the requisite approvals. To wit, compare August 13 and 14, 2010 internal email correspondence,

Lionelli to Timothy Spear ("But I still feel vaguely uneasy that we are entering uncharted and possibly hostile waters."); and Lionelli to MK parties ("Also on Monday, BTMK signs a term sheet with ReoStar which says that we will convert the Note into equity, pay off the subordinated loans (about $4 million) and end up owning 80% of ReoStar by August 31st. This term sheet has a very small probability of ever being consummated because of two key provisions. First, ReoStar must obtain consents and releases from 95% of all shareholders. This is almost impossible to accomplish. Even if it does, BTMK has reserved the right to insist on 100% consent. Second, ReoStar must have an investment banker sign a release renouncing his fees. The IB may be owed over $1 million in fees if the deal is consummated and he has already indicated that he will not sign a release."); with the August 23, 2010 Term Sheet, p.3 (requiring "Releases and consents from at least 95% of the Company's shareholders on or before September 15, 2010; provided that, BTMK reserves the right to adjust such amount to 100% if BTMK's due diligence determines that a lesser amount is not a reasonable risk given shareholder rights and/or potential for shareholder claims."). On August 13, 2010, before the Term Sheet was executed, Lionelli went so far as to state in an email to Timothy Spear and BTMK that "We need ReoStar's consent in order for Union Bank to sell us the note....The term sheet is a vehicle for getting consent, but it exposes us to risk."

### D. UNAUTHORIZED TRANSFER OF LINE OF CREDIT AND ASSIGNMENT OF LIENS

68. While Zouvas and BTMK were leading ReoStar to believe that BTMK was planning to make an investment in ReoStar, they were also leading Union Bank to believe that Union Bank's collateral (the assets of ReoStar) was of significantly lower value than Zouvas and BTMK actually thought. Zouvas and BTMK were misrepresenting BTMK's intent to ReoStar by

continuing to maintain that BTMK wanted to inject resources into ReoStar when that was not BTMK's actual intent.  Despite Zouvas's statement on July 29, 2010, copying the Board, that "Their (BTMK) language clearly, and unequivocally states that the offer [to Union Bank] is contingent on reaching a deal with [ReoStar]," in reality, Zouvas and BTMK were executing a "loan to own" scheme to acquire ReoStar's assets at a deep discount, that could then be sold for a higher price to a different "group" or used for their own purposes.

69.    ReoStar's Board did not consent to the assignment of its debt and obligations from Union Bank to BTMK, and Zouvas had no authority, and knew he had none, to sign any consent on behalf of ReoStar.  By now, and based on the manipulation of the transaction by Zouvas, Allen and the other Defendants, Union Bank desired to close with BTMK for an over 50% discount, or roughly $5.4 million. BTMK desired for the closing to occur no later than August 13, 2010, so it could immediately proceed to foreclose.  In order to obtain the needed signatures to the consent and LOI in time, Zouvas threatened the Board in an e-mail of August 13 that "we have been informed that Union Bank will file foreclosure papers this coming Monday [August 17, 2010]...."  Zouvas knew that threat was not imminent and his communication to the Board was false.  Foreclosure by Union Bank would have effectively cut off ReoStar's ability to partner with new investors because Union Bank, not ReoStar, would own ReoStar's assets.  Zouvas was making misrepresentations to ensure that a deal with BTMK, and no one else, was done.  That same day, Zouvas sent a release form to Janssens requesting Guilford International, Standard Atlantic, Niton, and all others involved waive any current or future claims against ReoStar in connection with the restructuring by BTMK, and stated such release was a significant condition to the LOI. Similar releases with no consideration and without

a signed LOI were disseminated by Zouvas to others, with threats the deal would be lost if not signed.

70.     In mid-August, ReoStar still was working on its Board approvals from late July, and the Board had not yet approved any resolutions drafted by Zouvas.  More importantly, the Board certainly did not approve the Consent Agreement circulated thereafter, as evidenced by Zouvas' email to Lionelli and others on August 15, 2010 expressing director approval to execute "the LOI", but not confirming any director or Board approval to execute the "consent assignment for Union Bank."

71.     Mark Holmes, counsel for Union Bank, sent a revised Consent Agreement to Zouvas on August 16, 2010 at 10:35 A.M.  Just three hours later, Zouvas returned the revised Consent Agreement back signed, saying the revised agreement was "approved by Board", but intentionally did not copy the Board.  However, in that three-hour window, Zouvas never obtained the Board's consent, and Union Bank and BTMK knew or should have known this based upon all the forgoing evidence.  In fact, when Zouvas' assistant asked him whether she should email the signed Consent Agreement to the Board, he promptly corrected her:  "Your [sic] joking, right?  Just to the people copied on my email…." [naming eight others, but not the Board in email exchange on August 16, 2010 at 2:27 P.M.] (emphasis supplied).

72.     BTMK immediately purchased (purportedly) the Credit Agreement from Union Bank the very next day, August 17, 2010.  The purchase agreement was executed on behalf of BT International by Carlos Fuenmayor, CEO.  On that same day, Union Bank transferred its rights under the  $25 Million Line of Credit with ReoStar to BTMK *for approximately $5.4 million* (the "**Transfer**"), a price that ReoStar's existing shareholders would have gladly paid *to retire the over $11.2 million in debt and to avoid foreclosure*.  But the deal was never presented

to them.  This was also an amount of money ReoStar could have easily raised through other legitimate investors.  But ReoStar was never afforded the opportunity.  As anticipated by Zouvas in an email exchange with BTMK on August 12, 2010, when he said "the loan purchase will look like a steal when we're done," it did, and it was.  In exchange for the approximately $5.4 million in consideration, BTMK was granted an assignment of the liens, deeds of trust, and security interests on all of ReoStar's assets (the "**Assignment**"), valued at that time by Union Bank to be in excess of $8 million. (The Transfer and Assignment described above are hereinafter referred to collectively as the "**Transfers**").[2]  No mention of the Transfers was made to the ReoStar Board.

73.    Leading up to the August 17, 2010 fraudulent Transfers,  Zouvas disseminated several documents, including, but not limited to several sets of "Resolutions Adopted by the Board of Directors of ReoStar" stating that the Board authorized and approved the Transfers and execution of that certain Consent Agreement, dated August 17, 2010.  In fact, the Board did not even know the Transfers occurred.  The Consent Agreement, likewise, was not authorized by the Board, and was executed without authorization, knowledge or approval of the ReoStar Board by: Zouvas for ReoStar, as Borrower, and Zouvas for ReoStar Gathering, ReoStar Operating, and ReoStar Leasing, each as Guarantors; Hintz for Union Bank; Odo Habeck, as CEO for MK Oil, and Christian Lovera as President for BancTrust.

74.    One day before the Term Sheet was executed under false pretenses and duress on August 22, 2010, Percival stated to his team at the MK Group that "we have no interest in the Rife/Bennett story, only to negotiate the note… [we] have no interest in them long term."

---

[2]    Notwithstanding the foregoing, ReoStar is not admitting that BTMK holds secured valid claims.

**THIRD AMENDED COMPLAINT**
**AND REQUEST FOR DECLARATORY JUDGMENT RELIEF**                                    **- Page 24**

75.     However, even then Zouvas was touting BTMK's capital commitment to the deal, including in the latest version of Zouvas's *signed* Shareholder Release Letter to Accelera Private Equity II Limited, on August 24, 2010, in which he stated: "Based on its work, BTMK feels ReoStar possesses enough attributes to warrant an investment, despite the challenges we, and all other small-cap E&P firms, face during these challenging times of raising capital....they [BTMK] have represented to the Company their willingness to invest as much as $200 million to realize their objective of creating a significant, upstream E&P company." (emphasis supplied). This, of course, is what the Board was told and understood; however, it was false. Soon thereafter, BTMK's counsel directed Zouvas to cut the "capital" references in the Shareholder Release Letter, stating that BTMK was not committed to providing the promised capital. Hours later, and without any Board approval or notice, Zouvas revised the Shareholder Release Letter. BTMK's counsel also required additional last minute releases to the Shareholder Release Letter with no capital commitment.

76.     After the Transfers were consummated, the Board had no choice but to execute the LOI. Thus, on August 25, 2010, the ReoStar Board, under duress, and to get BTMK to agree to a forbearance of its threatened foreclosure until September 30, 2010, authorized the LOI. BTMK, however, never had any interest or intention in completing the LOI and ReoStar shareholders and Board members were still being stonewalled by Zouvas from bringing other deals to the table. Instead of attempting to work out a deal with ReoStar which would inject capital into ReoStar, BTMK cut a secret side deal with BT for a $1.00 right of first refusal and moved to foreclose on the Line of Credit. Meanwhile, ReoStar's shareholders, as predicted by Lionelli, refused to sign the desired Shareholder Release Letter, which required the shareholders to release BTMK. Meanwhile, Zouvas was to obtain a minority equity position of new ReoStar

(see above), a guaranteed job, and/or a position going forward with BTMK. Placing his own and BTMK's interests above others, Zouvas was sure to include a release of BTMK in the Shareholder Release.

77.    Even as late as September 12, 2010, Zouvas continued to look out for the best interests only of BTMK, rather than ReoStar, by expressing to Allen via email that he was going to call Lionelli on Monday morning: "I am going to suggest they commence immediate foreclosure action in order to protect their interests." (emphasis supplied). In a September 13, 2010 email, Zouvas confessed his wrongdoings and expressed his regrets for turning on Rife (chairman of the Board and largest shareholder) and Joe Bill Bennett (one of largest shareholders) and instead siding with BTMK. Nevertheless, in a September 26, 2010 email to Allen, Zouvas stated "if Trey doesn't resign, then we will all resign en masse". On September 28, 2010, Zouvas and Allen were formally removed from ReoStar's Board by written action pursuant to ReoStar's bylaws of the requisite amount of shareholders.

### E. BTMK SENT FORECLOSURE NOTICE 44 DAYS AFTER LOAN PURCHASED

78.    On October 1, 2010, one day after the short forbearance period expired on September 30, 2010, BTMK through counsel at Gardere, sent an acceleration demand providing notice that it was accelerating the note due to the interest payment default. On October 12, 2010, BTMK through counsel at Gardere sent notice of foreclosure to ReoStar, indicating BTMK intended to foreclose on the assets of the Company if payment in full was not made by November 2, 2010. This was a complete surprise to ReoStar which had negotiated and provided information to BTMK so that BTMK could become an equity investor. At all times prior to the Transfers, Zouvas had continuously represented to the Board that BTMK purchasing the Line of Credit was "contingent on reaching a deal with [ReoStar]." Instead, BTMK used ReoStar's

information to value the company and then surreptitiously buy the debt and obtain the Assignments at an over 50% deep discount without ReoStar's knowledge, but with the full knowledge of Zouvas and Allen. Upon information and belief, BTMK, Zouvas, and Allen believed, at the time it offered the clearly incorrect and misleading valuation information to Union Bank, that the value of the liens were in excess of $10.8 million.

79.     On October 5, 2010, after their separate removal, Zouvas and Allen also resigned from the Board of ReoStar. Plaintiffs allege Zouvas resigned because at all relevant times prior to the Transfers, Zouvas, with the aid of Allen, blocked any other deals brought to the table by telling Bennett and Rife and other Board members, that presenting other deals to Union Bank would be a breach of the CNDA and/or LOI. Zouvas also told other investment bankers engaged by ReoStar to find a buyer to "hold off" on bringing deals other than BTMK's to Union Bank. Upon information and belief, Zouvas was trying to protect BTMK and prevent any other bidders from offering a better deal to ReoStar. Allen failed to properly and appropriately advise Zouvas with respect to actions taken, or disclose them to ReoStar's Board, and was aware that his actions were *ultra vires* and/or were not in the best interests of ReoStar.

80.     BTMK, acting in concert with the Defendants, got the result it wanted. It was able to make ReoStar believe (with the help of Zouvas) that it was interested in becoming a ReoStar investor so that it could obtain confidential, proprietary information. Zouvas and Allen, at some point early in the negotiations with BTMK, stopped acting in ReoStar's best interest and began making decisions and disclosures (or lack of disclosures) in their own best interests. Ultimately, BTMK used this information to buy the Line of Credit at a price it knew it could turn a profit for and immediately set to foreclose on the assets of ReoStar. Zouvas benefitted from this because he cut a deal with BTMK which provided that he would be employed by BTMK

**THIRD AMENDED COMPLAINT**
**AND REQUEST FOR DECLARATORY JUDGMENT RELIEF**                                    **- Page 27**

after the transaction and BTMK gained control of ReoStar through foreclosure of the lien securing the Line of Credit, but had no such assurances from any other potential buyer. Upon information and belief, Zouvas also had an agreement with BTMK to obtain a significant fee for the restructuring of ReoStar, if he could get the others engaged to waive their right to payment under their contracts.

81.     On November 1, 2010, the Plaintiffs were forced to file chapter 11 to avoid the foreclosure of BTMK.

82.     BTMK is a creditor in the Cases, having filed Proof of Claim No. 10 (the "**BTMK Claims**") in each of the Plaintiffs' respective cases. ReoStar objected to the BTMK Claims, and herein maintains those objections.

83.     Zouvas resigned as the Chief Executive Officer of ReoStar effectively on or about November 15, 2010, and on that date, Rife was appointed as the Chief Executive Officer of ReoStar. Zouvas is a creditor in the Cases, having filed Proof of Claim No. 20 in ReoStar's Case (the "**Zouvas Claim**"). ReoStar has filed an objection to the Zouvas Claim and is seeking disallowance in this case.

**F.      BTMK PRINCIPALS PLACED IN SEC RECEIVERSHIP LESS THAN 5 MONTHS LATER, REVEALING UNION BANK LOAN PURCHASED WITH MISAPPROPRIATED FUNDS**

84.     On January 14, 2011, Francisco Illarramendi ("**Illarramendi**") and MK Capital were named as defendants in a complaint filed by Receiver John J. Carney (the "**Receiver**"), and MK Asset Management was named as a relief defendant. The Order Appointing Receiver was entered on February 3, 2010. On July 5, 2011, MK Oil was added in all respects to the Receivership.

85. In the Receivership, the Receiver alleges that MK Oil obtained the funds to purchase the Reostar Note through receipt of misappropriated and fraudulently obtained funds. The Receiver alleges fraud, deceit, violation of federal securities laws, misappropriation of funds, and deliberate or reckless disregard of regulatory requirements against Illarramendi, the MK Group, the other MK entities they controlled, and each of their officers and directors, which includes Lionelli and Percival. It is the Receiver's position that all "Receivership Entities" were deeply intertwined and acted as the alter egos of each other in the fraudulent schemes perpetrated by the MK Group.

86. On March 7, 2011, Illarramendi "pleaded guilty in the criminal cases against him to two counts of wire fraud, one count of securities fraud, one count of investment advisor fraud, and one count of conspiracy to obstruct justice, conspiracy to obstruct an official proceeding and conspiracy to defraud the SEC. Plaintiffs contend that the Receivership Entities and their principals and agents, together with Zouvas's and Allen's breaches of duties, perpetrated a fraud on the Plaintiffs as described herein, causing significant negative results and economic damages to ReoStar.

### IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: DISALLOWANCE OF

### CLAIMS, LIENS, AND INTERESTS

87. To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

88. To the extent that any of the Defendants filed proofs of claim or interest in Plaintiffs' bankruptcy Cases, are listed in any filed schedule or list of claims or interests, or otherwise assert any lien, claim, or interest in or against property of the Plaintiffs' estates, such

claims, liens, and interest against Plaintiffs' estates should be disallowed and expunged in full in accordance with 11 U.S.C. § 506(a); and Sections 105(a) and 502(d) of the Bankruptcy Code because Defendants remain in possession of property of Plaintiffs recoverable under Section 542, 543 and 550 of the Bankruptcy Code; and because Defendants are transferees of the Transfers avoidable under sections 544, 547 and 548 of the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act, as set forth herein.

89.     Defendants should disgorge all gains flowing from their wrong and should not be allowed to profit as a result of the fraud perpetrated on the Plaintiffs. Defendants were benefited by ill-gotten funds when Defendants received payments in the bankruptcy Cases, including payments for adequate protection. Plaintiffs seek the disgorgement of any and all amounts received by the Defendants in the bankruptcy Cases, including any and all sale proceeds and/or adequate protection payments to the Defendants.

## SECOND CAUSE OF ACTION: DECLARATORY JUDGMENT FOR

## RECHARACTERIZATION OF BTMK'S PURPORTED

## SECURED CLAIMS AS EQUITY

90.     To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

91.     The Transfers and execution of the Consent Agreement were unauthorized by the Board of ReoStar and are the product of the Defendants' collaborative bad faith and breaches of duties owed to Plaintiffs. The Defendants' actions constitute some of the worst forms of fraud, collusion, civil conspiracy and lender liability. The purpose of the Transfers was so the Defendants could inequitably benefit and Defendants have inequitably benefitted from the Transfers and the profits or proceeds thereof, to the detriment of the Plaintiffs, forcing them into

Chapter 11 and then seeking to lift the stay to enforce the fraudulently obtained Liens. BTMK should be estopped by the doctrine of estoppel from pursuing its lift stay remedies based on its inequitable conduct and due to the recharacterization of its purported secured position to one of equity.

92.     Accordingly, in the alternative, and without prejudice to the previous count, Plaintiffs seek the recharacterization of the purported secured claims of BTMK as equity, rather than debt. The Court should declare the purported secured claims of BTMK are equity, rather than debt and declare BTMK is estopped from pursuing its lift stay remedies. BTMK acquired propriety and confidential company information through fraud and then used such information to perpetrate a scheme to "lend" funds to acquire a defaulted credit facility with covenants it knew ReoStar could not meet, allowing for its foreclosure on the entire Plaintiffs' assets. BTMK never intended to implement the LOI or reach a deal with ReoStar to convert the Union Bank debt to equity and/or infuse capital. The purpose, intent, and effect of the unauthorized Transfers were for BTMK to acquire ownership of ReoStar's assets, not to invest new capital for stock. As such, BTMK's claims should be recharacterized as of the Transfer Date, as equity and the Line of Credit, the Assignments, Liens, Deeds of Trust and Security Agreements, and execution of the Consent Agreement and related releases should be set aside and void without any force or effect as they were obtained through fraudulent means and were not authorized by the Plaintiffs' Board of directors, but rather were surreptitiously and illegally obtained.

### THIRD CAUSE OF ACTION: EQUITABLE SUBORDINATION OF CLAIMS AND INTERESTS

93.     To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

**THIRD AMENDED COMPLAINT**
**AND REQUEST FOR DECLARATORY JUDGMENT RELIEF**                                             **- Page 31**

94.     In the alternative, and without prejudice to the previous count, to the extent any Defendants' claims, liens, or interests are not disallowed and expunged, Defendants' remaining claims, liens, and interests, if any, should be equitably subordinated under sections 105(a) and 510(c).  Due to Defendants' inequitable conduct with regard to the Transfers, their claims in Plaintiffs' Cases should be equitably subordinated below the claims of secured creditors, priority unsecured creditors, and other general unsecured creditors, and their interests should be equitably subordinated (or expunged if an interest) below all other classes and holders of interests.

95.     Defendants' inequitable conduct leading up to and including the Transfers resulted in substantial injury to Plaintiffs and its creditors.  This, together with the fact that Defendants used their insider status and/or positions of power to take advantage of Plaintiffs and cause injury to its business and unsecured creditors, justifies the equitable subordination of their claims against Plaintiffs. The substantial inequitable conduct includes the acts alleged in this Adversary Proceeding, and in the Receiver's Complaint and related pleadings, and includes, but is not limited to, lending in bad faith, imposing an onerous forbearance period to complete a deal that Defendants never had any intention to complete, accessing and using financial information to harm the Plaintiffs that was not available to other potential investors, or ReoStar creditors, stonewalling marketing efforts to prevent competition among other investment groups, and exerting undue insider influence and control due to their positions of power based on manipulation of the transactions described herein to gain additional influence over the Plaintiffs' operations, decision making and execution of documents harmful to the Plaintiffs' best interests. Accordingly, equitable subordination of Defendants' claims and interests, if any, in Plaintiffs' Cases would be consistent with other provisions of the Bankruptcy Code, including sections 105(a) and 510(c)(1).

96.     Additionally, based on the foregoing, the Liens associated with the claims of Defendants should be set aside for the benefit of the estates under Sections 105(a) and 510(c)(2); and, BTMK should be estopped by the doctrine of estoppel from pursuing its lift stay remedies based on its inequitable conduct.

97.     Furthermore, Defendants should disgorge all gains flowing from their wrong and should not be allowed to profit as a result of the fraud perpetrated on the Plaintiffs. Plaintiffs seek the disgorgement of any and all amounts received by the Defendants in the bankruptcy Cases, including any and all sale proceeds and/or adequate protection payments to the Defendants.

## FOURTH CAUSE OF ACTION FRAUDULENT TRANSFER

98.     To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

99.     The Transfers constitute fraudulent transfers avoidable and recoverable under the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE § 24.001 et seq., made applicable to this adversary proceeding by 11 U.S.C. §§ 544 and 550, and also constitute fraudulent transfers avoidable and recoverable under 11 U.S.C. §§ 548 and 550.

### A. Tex. Bus. & Comm. Code § 24.005(a)

100.    Pursuant to Tex. Bus. & Comm. Code § 24.005(a), at all relevant time periods before or after the Transfers were made, Plaintiffs had one or more creditors, including those creditors listed on Plaintiffs' schedules and claims register in Plaintiffs' Cases.

101.    Pursuant to Tex. Bus. & Comm. Code § 24.005(a)(2), Plaintiffs made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers.

102. Pursuant to Tex. Bus. & Comm. Code § 24.005(a)(2)(A), at all relevant time periods before or after the Transfers were made, Plaintiffs were engaged in or were about to engage in a business or transaction for which the remaining assets of Plaintiffs were unreasonably small in relation to the business or transaction.

103. Pursuant to Tex. Bus. & Comm. Code § 24.005(a)(2)(B), at all relevant time periods before or after the Transfers were made, Plaintiffs intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

104. Pursuant to Tex. Bus. & Comm. Code § 24.009(b), BTMK was either the first transferee of the Transfers and the entity for whose benefit the Transfers were made, or the subsequent transferee of the Transfers other than a good faith transferee who took for value or from any subsequent transferee.

105. Plaintiffs and its creditors have been harmed by these fraudulent Transfers, and all have suffered both monetary and non-monetary/equitable damages as a result. Plaintiffs seek to avoid the Transfers, recover the full value of the Transfers made, and obtain such other relief as requested herein. Specifically, but without limitation, Plaintiffs seek to avoid the full amount of the Transfers, plus interest, costs, and attorneys' fees.

### B. Tex. Bus. & Comm. Code § 24.006(a)

106. Pursuant to Tex. Bus. & Comm. Code § 24.006(a), at all relevant time periods before the Transfers were made, Plaintiffs had one or more creditors, including those creditors referenced above in Section A of this Count.

107. Pursuant to Tex. Bus. & Comm. Code § 24.006(a), Plaintiffs made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers.

108.    Pursuant to Tex. Bus. & Comm. Code § 24.006(a), at all relevant time periods in which the Transfers were made, Plaintiffs were insolvent, or became insolvent as a result of the Transfers.

109.    Pursuant to Tex. Bus. & Comm. Code § 24.009(b), BTMK was the first transferee of the Transfers and the entity for whose benefit the Transfers were made, or the subsequent transferee of the Transfers other than a good faith transferee who took for value or from any subsequent transferee.

110.    Plaintiffs have been harmed by the fraudulent Transfers, and have suffered both monetary and non-monetary/equitable damages as a result. Plaintiffs seek to avoid the Transfers, recover the full value of the Transfers made, and obtain such other relief as requested herein. Specifically, but without limitation, Plaintiffs seek to avoid and recover the full amount of the Transfers, plus interest, costs, and attorneys fees.

### C. 11 U.S.C. § 548(a)

111.    Pursuant to Section 548(a) of the Bankruptcy Code, the Transfers are avoidable because they were made within two (2) years before the Plaintiffs' Petition Date, Plaintiffs received less than a reasonably equivalent value in exchange for the Transfers, and Plaintiffs either (a) were insolvent on the dates the Transfers were made, or became insolvent as a result of such Transfers, (b) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with Plaintiffs was unreasonably small capital, or (c) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

112.    Plaintiffs have been harmed by the fraudulent Transfers, and have suffered both monetary and non-monetary/equitable damages as a result. Plaintiffs seek to avoid the Transfers,

recover the full value of the Transfers made, and obtain such other relief as requested herein. Specifically, but without limitation, Plaintiffs seek to avoid, pursuant to Section 548, and recover, pursuant to Section 550, the full amount of the Transfers, plus interest, costs, and attorneys fees.

## FIFTH CAUSE OF ACTION: PREFERENTIAL TRANSFER

113. To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

114. The Transfers constitute preferential transfers avoidable and recoverable under 11 U.S.C. §§ 547 and 550.

115. The Transfers were made to or on account of BTMK, based on antecedent debt owed by the Plaintiffs, at a time when the Plaintiffs were insolvent, causing BTMK to receive more than they would have received if the Bankruptcy Case was one under Chapter 7 of the Bankruptcy Code and the Transfers had not been made. As such, Plaintiffs seek to avoid and recover the Transfers under 11 U.S.C. §§ 547(b) and 550.

## SIXTH CAUSE OF ACTION: TURNOVER OF PROPERTY OF THE ESTATES

116. To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

117. To the extent Defendants' claims are recharacterized, subordinate and/or avoided and set aside, Defendants are obligated to turn over the Transfers, Assignments, Liens, Deeds of Trust and Security Interests to Plaintiffs' bankruptcy estates, and any and all other property, profits or proceeds constituting property of Plaintiffs' estates under 11 U.S.C. § 541, pursuant to 11 U.S.C. § 542(b) and 543. To the extent the Transfers are avoided or set aside under sections 105(a), 510(c), 544, 547, 548 or 550 of the Bankruptcy Code, the Plaintiffs seek an order of

turnover in the amount of such Transfers and Assignments plus any and all profits or proceeds thereof constituting property of Plaintiffs' estates under 11 U.S.C. § 541, pursuant to sections 542 and 543.

## SEVENTH CAUSE OF ACTION: UNJUST ENRICHMENT

118.    To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

119.    In the alternative to the other counts herein, and without waiving same, Plaintiffs plead for recovery under the doctrine of unjust enrichment.

120.    BTMK benefited unjustly by wrongfully obtaining the Transfers without reasonably equivalent consideration in return.

121.    BTMK will continue to be unjustly enriched if they are able to keep such benefits without compensating Plaintiffs for the same.

122.    Therefore, Plaintiffs seek damages from BTMK pursuant to the doctrine of unjust enrichment in the full amount of the Transfers, plus interest, attorneys fees, and costs to the fullest extent allowed by law.

## EIGHTH CAUSE OF ACTION: FRAUDULENT INDUCEMENT AND CONSPIRACY

123.    To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

124.    Defendants BTMK, BT, BT International, Lovera, and Fuenmayor acted in concert to perpetrate fraud on Plaintiffs in illegally obtaining the Transfers.

125.    Plaintiffs have suffered injuries as a proximate result of the conspiracy of Defendants BTMK, BT, BT International, Lovera, and Fuenmayor, and the fraud perpetrated thereby.

126.    Because the conspiracy was committed with intent and malice, Plaintiffs are entitled to exemplary damages.

127.    Defendants BTMK, BT, BT International, Lovera, and Fuenmayor were fully aware that they possessed and knew the details of confidential and proprietary information related to the business and financial value of ReoStar.  They also knew they had to block any other investors from investing equity in ReoStar before BTMK purchased the Line of Credit from Union Bank.   Defendants BTMK, BT, BT International, Lovera, and Fuenmayor manifested this intent by, among other things, offering certain deal points to ReoStar in numerous versions of "Term Sheets" (the LOI) drafted by BTMK's lawyers that included offers to the ReoStar Board of directors and ReoStar shareholders that they did not intend to keep.  The Defendants BTMK, BT, BT International, Lovera, and Fuenmayor each participated in this activity for their own personal gain.

128.    Given their true intent to obtain the assets of ReoStar, rather than simply to make an investment in ReoStar (as outlined in the Term Sheet/LOI) Defendants BTMK, BT, BT International, Lovera, and Fuenmayor, acting individually and in concert, conspired to and did, in fact, fraudulently mislead and misrepresent to ReoStar their true intentions in gaining access to confidential and proprietary financial and business information and induce ReoStar's Board of Directors to execute and abide by the LOI when they knew they would not close the transaction and their true intent was to acquire the Line of Credit at a deep discount.  The actual motive of Defendants BTMK, BT, BT International, Lovera, and Fuenmayor in offering and executing the LOI was to prevent any other equity investors from doing a deal with ReoStar so that BTMK could then foreclose on ReoStar's assets and all the Defendants BTMK, BT, BT International, Lovera, and Fuenmayor could reap a planned windfall by obtaining ReoStar's assets at a

significant discount.  As a proximate result of the fraudulent inducement and restrictions placed on ReoStar by the terms of their fraudulently obtained agreements to access information and enter into the terms of the LOI, ReoStar was blocked from pursuing any other deals that would have achieved ReoStar's intent to recapitalize and reorganize, and they were able to wrongfully obtain assets at a deep discount, causing ReoStar to suffer damages in the full amount of the Transfers, plus interest.

129.    The actions of Defendants BTMK, BT, BT International, Lovera, and Fuenmayor were flagrant and egregious.  As such, Plaintiffs seek an additional recovery from them of punitive/exemplary damages.

### NINTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY

130.    To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

131.    As the Chief Executive Officer, and Director of Plaintiffs, Zouvas owed Plaintiffs fiduciary duties of trust and loyalty.  As the Chief Financial Officer, Allen owed Plaintiffs fiduciary duties of trust and loyalty.  Each of Zouvas and Allen breached these duties through their inequitable and fraudulent actions in mismanagement of Plaintiffs by authorizing and directing the Transfers to be made without authorization from the Board and knowing full well that Plaintiffs were insolvent and had nothing to gain in exchange for the Transfers to the Defendants.  These actions caused injury to Plaintiffs and its creditors, to the benefit of the Defendants.

132.    Plaintiffs were guided by the judgment or advice of Zouvas and Allen and were justified in believing that parties would act in Plaintiffs' interests, among other things, to act only upon proper Board authorization and cause Plaintiffs to perform only legitimate business

transactions for reasonably equivalent value. Zouvas and Allen, acquired significant and overwhelming influence over Plaintiffs, known by Defendants, and, despite this, Defendants abused that influence.

133. In their dealings with BTMK, Union Bank and potential investors, Zouvas, and Allen failed to act in the best interest of ReoStar, but acted in their own, personal best interest. Zouvas and Allen carefully screened the information disclosed to the rest of ReoStar's Board of directors and shareholders to prevent them from looking at other, potentially better deals for ReoStar and to attempt to ensure that BTMK was the only option as an investment partner. Zouvas and Allen also actively blocked, by false representations and baseless threats, any attempt to bring another equity investor to the table.

134. The misrepresentations and failures to disclose material information to the ReoStar Board of directors and shareholders by Zouvas and Allen prevented ReoStar from being able to assess other potential buyers offering better deals for the company and its shareholders. Zouvas and Allen made these false representations to ReoStar and its Board, such as misrepresenting the duration of the exclusivity period with BTMK, to protect BTMK to the detriment of ReoStar. The misrepresentations and failures of Zouvas and Allen to disclose material information to the ReoStar Board allowed BTMK to purchase the Line of Credit at an incredibly low discount without competing offers, which purchase would have been prevented had the ReoStar Board of directors received truthful, full disclosure. The misrepresentations, failures to disclose and refusals to permit the consideration of deals from other potential investors by Zouvas and Allen deprived ReoStar and its Board the opportunity to consider other, potentially better offers. The actions of Zouvas and Allen in so doing were intentional misconduct, fraud, and a breach of their fiduciary duties as officers and directors for ReoStar.

135.    In their dealings with ReoStar's Board, Zouvas and Allen owed the Board of Directors a duty of loyalty and fair dealing.    Zouvas and Allen breached their duties of care and loyalty owing to the ReoStar Board, shareholders and creditors.    As a proximate result of Zouvas's and Allen's breaches of fiduciary duty, ReoStar was blocked from doing any other deal, ReoStar was prevented from recapitalizing and reorganizing, and BTMK was able to wrongfully obtain assets at a deep discount, causing ReoStar to suffer damages in at least the amount of the Transfers.

136.    Zouvas's and Allen's actions were flagrant and egregious.    As such, Plaintiffs seek an additional recovery from them of punitive/exemplary damages.

137.    Defendants owed the duty of a fiduciary to Plaintiffs on account of their relationship and the fact that Defendants were obtaining loans owed by Plaintiffs.

138.    That fiduciary duty to Plaintiffs was breached, among other times, when the Transfers occurred. This breach caused injury to Plaintiffs and benefit to Defendants.

139.    Defendants were co-conspirators to Zouvas and vice versa. As a result of Defendants' breaches of duty, fraud and conspiracy, Defendants completed the Transfers knowing that the transaction was not authorized and was the product of a breach of fiduciary duty, and to the detriment of Plaintiffs.

140.    The Defendants' breaches directly caused Plaintiffs' damages, and Defendants are now liable to Plaintiffs for such damages of at least the full amount of the Transfers, all legal fees, costs and expenses paid to counsel, plus interest.

## TENTH CAUSE OF ACTION: KNOWING PARTICIPATION IN BREACH OF

## FIDUCIARY DUTY

141.    To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

142.    Defendants knew Zouvas was on the Board of directors of ReoStar and knew of Zouvas' fiduciary relationship with ReoStar. Defendants also knew Zouvas was not making full and truthful disclosures to ReoStar in order to benefit BTMK. In fact, Defendants improperly utilized Zouvas' power and position to obtain confidential, proprietary information, including but not limited to the value and potential value of ReoStar's assets and the Line of Credit, as well as to persuade the other ReoStar Board members of the benefits of doing a deal with BTMK that was contrary to the best interests of ReoStar and its shareholders. Defendants worked with Zouvas to induce him to breach his fiduciary duty of loyalty and fair dealing to ReoStar, and Defendants capitalized on Zouvas' malfeasance and willingness to accommodate BTMK by obtaining assets at a deep discount, to the detriment of ReoStar, its shareholders and its creditors.

143.    As a proximate result of Defendants' knowing and conspiratorial participation in Zouvas' breach of fiduciary duty of loyalty, ReoStar was blocked from doing any other deal, ReoStar was prevented from recapitalizing and reorganizing and BTMK was able to wrongfully obtain assets at a deep discount, causing ReoStar to suffer damages in the full amount of the Transfers, plus interest.

144.    Defendants' actions were egregious. As such, Plaintiffs seek an additional recovery from Defendants of punitive/exemplary damages.

## ELEVENTH CAUSE OF ACTION: NEGLIGENCE

145.     To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

146.     Zouvas and Allen owed duties to the Plaintiffs as their officers and breached those duties based on the allegations set forth herein.  As such, Zouvas and Allen were negligent in their mismanagement of Reostar.  As a result, ReoStar was blocked from doing any other deal, ReoStar was prevented from recapitalizing and reorganizing, and BTMK was able to wrongfully obtain assets at a deep discount, causing ReoStar to suffer damages in at least the full amount of the Transfers, plus interest.  Plaintiffs seek to avoid and recover the full amount of fees and expenses paid to them, plus interest, costs, and attorneys fees.

147.     Defendants' actions were egregious and injury was a foreseeable consequence of the Defendants' behavior.  As such, Plaintiffs seek an additional recovery from Defendants of punitive/exemplary damages.

## TWELTH CAUSE OF ACTION: GROSS NEGLIGENCE

148.     To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

149.     Zouvas and Allen owed duties to Plaintiffs as their officers and Zouvas and Allen blatantly and indifferently violated those duties based on the allegations set forth herein.  As such, Zouvas and Allen were grossly negligent in their mismanagement of Reostar.  As a result, ReoStar was blocked from doing any other deal, ReoStar was prevented from recapitalizing and reorganizing, and BTMK was able to wrongfully obtain assets at a deep discount, causing ReoStar to suffer damages in at least the full amount of the Transfers, plus interest.  Plaintiffs

seek to avoid and recover the full amount of fees and expenses paid to them, plus interest, costs, and attorneys fees.

150.    Defendants' actions were egregious and injury was a foreseeable consequence of the Defendants' behavior.  As such, Plaintiffs seek an additional recovery from Defendants of punitive/exemplary damages.

### THIRTEENTH CAUSE OF ACTION: BREACH OF CONTRACT

151.    To the extent not inconsistent, Plaintiffs incorporate all of the foregoing paragraphs and allegations as if set forth fully herein.

152.    BT was a party to a valid contract entitled Confidentiality and Non-Circumvention Agreement entered into as of November 16, 2009, by Niton on behalf of Plaintiffs as beneficiaries.  Through the Confidentiality and Non-Circumvention Agreement, BT obtained access to confidential information "with regard to the prospective sale of [ReoStar]", not the sale of ReoStar's debt.  BT also agreed, among other things, it shall use the confidential information obtained through the Confidentiality and Non-Circumvention Agreement "for the purpose of: (evaluating potential business relationships and opportunities with [Plaintiffs])", not including the purchase of ReoStar's debt.  BT further obtained the confidential information on behalf of itself or "a third party introduced by the recipient", later meaning BTMK.  Both BT and BTMK were aware of the Confidentiality and Non-Circumvention Agreement and their obligations and duties thereunder.  All conditions precedent to BT's and BTMK's obligations and duties under the Confidentiality and Non-Circumvention Agreement had occurred.

153.    BT and BTMK materially breached their promises and agreements within the Confidentiality and Non-Circumvention Agreement, by, among other things, not adhering to their promises therein and instead using confidential information contrary to the terms of the

Confidentiality and Non-Circumvention Agreement and to the Plaintiffs' detriment. BT's and BTMK's actions proximately caused substantial damages to the Plaintiffs as stated herein.

154. As such, for BT's and BTMK's breaches of a written contract, Plaintiffs seek damages, plus interest, attorneys fees, and costs to the fullest extent of the law, including, without limitation, under Chapter 38 of the Texas Civil Practice and Remedies Code.

## V.   RESERVATION

155. Plaintiffs reserve the right to further amend this Complaint to add or supplement parties or causes of action upon conduct and/or completion of discovery and in the interest of justice and allowed by the Court.

## VI.   REQUEST FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully request that upon trial of this action that this Court will grant it the relief requested herein against Defendants, individually, severally, and/or jointly, as follows:

    a.    Disallowance, or in the alternative, recharacterization or equitable subordination of any and all claims, liens, and interests of the Defendants against Plaintiffs' estates, including but not limited to claims, liens, and interests in the Plaintiffs' bankruptcy cases;

    b.    Disgorgement of any and all amounts received by the Defendants in the bankruptcy cases, including any and all sale proceeds and/or adequate protection payments to the Defendants;

    c.    Exemplary and/or punitive damages;

    d.    Judgment for damages as described herein;

    e.    Turnover by the Defendants of the Transfers, Assignments, Liens, Deeds of Trust and Security Interests to Plaintiffs' bankruptcy estates, and any and all other property, profits or proceeds constituting property of Plaintiffs' estates;

f.      Pre-judgment and post-judgment interest at the highest rate allowed by law;

g.      Reasonable and necessary attorneys' fees and expenses;

h.      Costs of suit;

All other relief, both special and general for which Plaintiffs may show itself entitled

Dated:  April 26, 2012.                          Respectfully submitted,

                                                 **CANTEY HANGER, LLP**

                                                 _____
                                                 Bruce W. Akerly
                                                 Texas Bar No. 00953200
                                                 Arthur A. Stewart
                                                 Texas Bar No. 19203500
                                                 1999 Bryan Street, Suite 3330
                                                 Dallas, Texas  75201
                                                 Telephone:  (214) 978-4100
                                                 Facsimile:  (214) 978-4150

                                                 **COUNSEL FOR PLAINTIFFS**
                                                 **REOSTAR ENERGY CORP.,**
                                                 **REOSTAR GATHERING, INC.,**
                                                 **REOSTAR LEASING, INC., AND**
                                                 **REOSTAR OPERATING, INC.**