

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG - 3 2012

CLERK, U.S. DISTRICT COURT
By_____
                    Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN RE: | § |
| | § Bankruptcy Case No. |
| REOSTAR ENERGY CORPORATION, | § 10-47176-dml-11 (as |
| ET AL., | § consolidated for Joint |
| | § Administration with |
| Debtors. | § Bankruptcy Case Nos. |
| | § 10-47198; 10-47201; |
| | § and 10-47203) |
| REOSTAR ENERGY CORPORATION, | § |
| | § |
| Plaintiff, | § Adversary No. 11-4022-dml |
| | § |
| VS. | § |
| | § District Court Case No. |
| BT AND MK ENERGY AND | § No. 4:12-CV-046-A |
| COMMODITIES, LLC, ET AL., | § |
| | § |
| Defendants. | § |

MEMORANDUM OPINION
and
ORDER

Before the court for decision is the motion of defendants

Mark Zouvas ("Zouvas") and Scott Allen ("Allen") (collectively,

"movants") to strike and dismiss the pleading of plaintiff,

ReoStar Energy Corporation ("Energy"), for failure to state a

claim upon which relief can be granted.  The court has concluded

that such motion should be granted in part and denied in part.

I.

History of the Litigation

This action was initiated February 17, 2011, by the filing

by Energy of a complaint in an adversary proceeding in a Chapter

11 bankruptcy case in which Energy and other entities were
debtors.  Energy filed its first amended complaint on March 7,
2011, and its second amended complaint, adding new defendants, on
June 22, 2011.  After withdrawal of the reference as to this
action, Energy filed its third amended complaint on May 8, 2012.[1]

On May 29, 2012, movants filed their joint motion to dismiss
the claims asserted against them in the third amended complaint
("Complaint").  They argued that dismissal was appropriate
because of Energy's failure to state a claim against them.  The
motion also sought to strike portions of the Complaint for
failing to abide by this court's order of April 13, 2012, which
ordered Energy to remove the improper and superfluous language in
its pleadings.  Energy filed a response to the motion, seeking
leave to amend the Complaint in the event that the court
dismissed its claims against movants. Movants filed a reply.

II.

Allegations of the Complaint

The Complaint is inappropriately verbose.  By an order the
court signed on April 13, 2012, the court alerted Energy and its
counsel to the court's concern relative to the wordiness of the
document Energy was proposing at that time to file as the third

---

[1]Three corporate entities were added as plaintiffs, along with Energy, in the third amended
complaint.  Those three entities were dismissed by an order and final judgment as to certain parties the
court signed July 12, 2012.

amended complaint, and the court urged it to more carefully word the proposed amended complaint if they again sought leave to file one.   For all practical purposes, Energy disregarded the concerns and suggestions of the court.   Piercing the excess verbiage, the essence of the Complaint is as follows:

In 2008, Energy, an oil and gas company, was low in funds and in need of capitalization.   At the time, it had a $11.2 million outstanding line of credit from Union Bank of California ("Union Bank").   The credit line was secured by all of Energy's assets and was senior to all other long-term debt of Energy.   In early 2009, Energy was not technically in compliance with its credit agreements with Union Bank.   As a result, Energy pursued two options in its quest for additional financing: (1) financing from majority shareholders, and (2) investment from potential third-party investors.   In October 2009, Zouvas, the chief executive officer, president, and a director of Energy, presented a proposal for financing from the majority shareholders; this proposal was ultimately declined, as the shareholders favored investment from third-party investors.

In the meantime, Zouvas had begun negotiations with, and cultivating interest from, potential third-party buyers.   Zouvas found an interested buyer in a Venezuelan group headed by Carlos Fuenmayor ("Fuenmayor") and Christian Lovera ("Lovera"), who

operated through BancTrust & Co. ("BT"), BT International, Inc.
("BT International"), and related entities such as BT and MK
Energy and Commodities, LLC ("BTMK").  In pursuit of such a deal,
in November 2009, BT executed a confidentiality and non-
circumvention agreement with Niton Capital Partners, S.A.
("Niton"), which was authorized to conduct due diligence on
Energy.  The agreement provided that Niton would provide
confidential information about Energy to BT for the exclusive
purpose of "evaluating potential business relationships and
opportunities with [Energy]."  Compl. at 8, ¶ 25.  BT created
BTMK in January 2010 for the purposes of having a vehicle to
inject cash into another entity, Magnolia Hill Resources, LLC,
that would in turn funnel money to Energy.

Zouvas failed to aggressively pursue alternative financing
options.  Instead, he shut out potential third-party investors
who could have actually contributed capital to the company, and
thus did not act in the company's best interest, in spite of his
fiduciary obligations to Energy.  Zouvas and Allen, who acted as
Chief Financial Officer of Energy, gave BT direct and
unrestricted access to Energy's major lender, Union Bank, without
safeguarding Energy's position during the debt restructuring
talks.  On March 29, 2010, Allen executed a release agreement on
behalf of Energy to allow MK Capital (a BT affiliate) to conduct

4

due diligence on Energy and to communicate directly with Union

Bank about "a financial transaction between it and Michael

Kenwood Capital Management." Compl. at 11, ¶ 36.

During his negotiations, Zouvas failed to take several key

precautions to protect Energy's position,[2] and also failed to

keep the Board and shareholders informed about the true nature of

the deals.[3] As a result of Zouvas's actions, BT was able to

obtain exclusive access to Energy's proprietary and financial

information, including information about the company's most

valuable assets.

The failure to take these standard precautions was

intentionally done to give BT a bargaining advantage in

negotiations with Energy and Union Bank. On August 17, 2010,

BTMK purchased the $11.2 million debt from Union Bank at the

discounted value of $5.4 million. BTMK was granted an assignment

of the liens, deeds of trust, and security interests on all of

Energy's assets, valued at that time by Union Bank to be in

excess of $8 million. BT then accelerated the note it now owned

---

[2]For instance, Zouvas neglected to conduct necessary due diligence that would have revealed that Lovera had been disciplined for financial trading misconduct in prior employment.

[3]Energy's Board did not consent to the assignment of its debt from Union Bank to BT; and, Zouvas had no authority, and knew he had none, to sign any consent on behalf of Energy.

and sought to foreclose on the loan in order to claim the company's assets.

Energy was powerless to prevent BT from seizing control of Energy, because Energy had lost whatever leverage it had with BT once BT purchased the debt from Union Bank.[4]  Consequently, BT did not invest in Energy as originally promised, as it no longer had any financial incentive to do so.  As for Zouvas, he was guaranteed a position of employment in Energy after BT assumed control of the company, though he resigned from his CEO role in November 2010.

Energy's shareholders were cheated out of the real value of their ownership stake in the company.  Energy's shareholders would have been perfectly willing to pay off the $5.4 million debt rather than lose control over the company and its assets to BT.  Throughout the dealings, Zouvas shut out the board, the shareholders, and third-party investors, simply to give BT an unfair bargaining advantage.  In the end, BT raided Energy for its assets, and was successful because of complicity from Energy officers and BT affiliates and officers.  To avoid losing its

---

[4]The deal with BT imposed near impossible requirements as preconditions for BT's investment in Energy: a 95% minimum for shareholder approval, coupled with the option for BT to demand 100% shareholder approval, along with a prohibition on the recovery of any investment banker fee. Because none of these conditions were realistic, they effectively ensured there would be no approval from Energy shareholders for a deal with BT.

assets in foreclosure, Energy filed a petition for Chapter 11
bankruptcy, the bankruptcy case in which this action was
initiated as an adversary proceeding.

*     *     *     *     *

Energy asserted thirteen causes of action in the Complaint:

1st     a request for the disallowance of claims, liens and
        interests under 11 U.S.C. §§ 105(a), 502(d) and
        506(a);

2nd     a request for declaratory judgment for
        recharacterization of BTMK's purported secured
        claims as equity;

3rd     a request for equitable subordination of claims and
        interests under 11 U.S.C. §§ 105(a) and 510(c);

4th     a claim for fraudulent transfer under the Texas
        Uniform Fraudulent Transfer Act, sections 24.005(a)
        and 24.006(a) of the Texas Business and Commerce
        Code, and under 11 U.S.C. §§ 548 and 550;

5th     a claim for preferential transfer avoidable and
        recoverable under 11 U.S.C. §§ 547 and 550;

6th     a claim for the turnover of property of the estates
        under 11 U.S.C. §§ 541, 542, and 543;[5]

---

[5]Section 541 defines "Property of the Estate"; section 542 covers the turnover of property
(continued...)

7th      a claim for unjust enrichment;

8th      a claim for fraudulent inducement and conspiracy;

9th      a claim for breach of fiduciary duty;

10th     a claim for knowing participation in breach of

         fiduciary duty;

11th     a negligence claim;

12th     a gross negligence claim; and

13th     a breach of contract claim.

The motion to dismiss seeks only to dismiss the 1st, 2nd, 3rd, 9th, 10th, 11th, and 12th causes of actions. As the parties apparently recognize, the 4th through 8th causes of actions are not directed against Zouvas and Allen. Thus, the court is only considering the 1st, 2nd, 3rd, 9th, 10th, 11th, and 12th causes of actions in evaluating the motion to dismiss.

II.

Applicable Standard

A.   The Rule 8(a)(2) Pleading Standards

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, in a general way, the applicable federal court standard of pleading.  It requires that a complaint contain "a short and

---

[5](...continued)
belonging to the estate; and section 543 covers the turnover of property belonging to the estate by a custodian. 11 U.S.C. §§ 541, 542, 543.

plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks and ellipsis omitted).  Although a complaint need not contain detailed factual allegations, the "showing" contemplated by Rule 8 requires the plaintiffs to do more than simply allege legal conclusions or recite the elements of a cause of action. See Twombly, 550 U.S. at 555 & n.3.  Thus, while a court must accept all of the factual allegations in the complaint as true, it need not credit bare legal conclusions that are unsupported by any factual underpinnings.  See Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Moreover, to survive a motion to dismiss for failure to state a claim, the facts pleaded must allow the court to infer that the plaintiffs' right to relief is plausible. Iqbal, 129 S. Ct. at 1950.  To allege a plausible right to relief, the facts pleaded must suggest liability; allegations that are merely consistent with unlawful conduct are insufficient. Twombly, 550 U.S. at 566-69. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task

9

that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950.

As for the motion to strike the improper language in the Complaint, Rule 12(f) allows the court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Cambridge Toxicology Group, Inc. v. Exnicios, 495 F.3d 169, 178 (5th Cir. 2007). A motion to strike from any pleading any insufficient, redundant, immaterial, impertinent, or scandalous matter should be granted when the language has no relation to the controversy. Fed. R. Civ. P. 12(f).

### III.

### Analysis

The court has concluded that the allegations as to some, but not all of the causes of action fall short of the federal court pleading standards.

A.   The 1st Through 3rd Causes of Action

The court concludes these first three causes of action must be dismissed as to movants because each is premised on a fraudulent or preferential transfer theory, and Energy has failed to adequately allege the requirements for either theory against movants.

A trustee or a debtor-in-possession can avoid a transfer that is either preferential under section 547(b)[6] of the Bankruptcy Code, or fraudulent under section 548(a)[7] of the Bankruptcy Code; however, in either instance, the transfer must be "of an interest of the debtor in property." Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg.), 81 F.3d 592, 595 (5th Cir. 1996). "[A]n interest of the debtor in property" includes all property that would be included in the debtor's estate pursuant to 11 U.S.C. § 541, which includes "all legal or equitable interests of the debtor in property as of the

---

[6]Section 547(b), titled "Preferences," authorizes the trustee to avoid "any transfer of an interest of the debtor in property" made:
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made--
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if--
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b).

[7]Section 548, titled "Fraudulent Transfers and Obligations," authorizes the trustee to avoid any fraudulent "transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor." 11 U.S.C. § 548. Again, the property being transferred must be "an interest of the debtor in property." Id.

commencement of the case." <u>Begier v. IRS,</u> 496 U.S. 53, 59 (1990).

"The primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminishe[s] the resources from which the debtor's creditors could have sought payment." <u>Jenkins</u>, 81 F.3d at 595 (holding that if funds cannot be used to pay creditors, the funds are not property of the debtor's estate under the fraudulent or preferential transfer theories). The same test for defining property of a debtor' estate applies in fraudulent transfer claims brought under the Texas Business and Commerce Code §§ 24.005 and 24.006,[8] made applicable to bankruptcy cases pursuant to 11 U.S.C. § 544. <u>See</u> <u>In re IFS Fin. Corp.</u>, 669 F.3d 255, 261 (5th Cir. 2012) (applying the <u>Begier</u> definition for an "interest of the debtor in property" to fraudulent transfer claims brought under sections 24.005 and 24.006 of the Texas Business and Commerce Code).

Energy has failed to plead a cause of action based on a theory of fraudulent transfer or preferential transfer. Instead of seeking to avoid transfers by the debtors of the debtors'

---

[8]Both sections 24.005 and 24.006 of the Texas Business and Commerce Code concern "transfer[s] made . . . by a debtor." Tex. Bus. & Comm. Code §§ 24.005, .006. In this case, the transfer was not made by the debtor, but its creditor, Union Bank, to another party, BT.

property, Energy seeks to avoid transfers from a third party to
another third party--involving property that the debtors did not
own.  Specifically, Energy defines the "Transfers" it seeks to
avoid as a transfer by Union Bank of "its [Union Bank's] rights
under the $25 Million Line of Credit with [Energy] to BTMK."  See
Compl. at 23, ¶ 72.  Energy has failed to allege how it, as the
debtor, had any right, legally or equitably, in and to Union
Bank's ownership of the property Union Bank sold and transferred
to BTMK.  The Complaint contains no facts alleging that Union
Bank's assets were available for payment to Energy's creditors.
Indeed, this deficiency is reinforced by the allegation that
Energy's existing shareholders "would have gladly" purchased the
debt from Union Bank had Union Bank "presented" an offer to them.
See id. at 23-24, ¶ 72.  This allegation therefore makes plain
that asset could not have been property of Energy's current
estate.

As an additional reason for dismissal of the 1st cause of
action against Allen, the court notes there is no allegation
Allen has made any claim, lien or interest to be disallowed.  And,
as additional reasons for dismissing the 2nd and 3rd causes of
action against Allen or Zouvas, the court notes there is no
allegation that either movant purports to have a secured claim
that can be recharacterized as equity, and there is no allegation

that either movant has a claim or interest that could be subject
to equitable subordination.

As the allegations in the Complaint do not support any of
the first three causes of action, the court is dismissing the
first three causes of action as to movants.

B.   The 9th Cause of Action

The court now considers the 9th claim, which concerns the
breach of fiduciary duty allegedly owed by movants to Energy.

To recover upon a breach of fiduciary duty claim, Energy
must first establish that movants were fiduciaries of Energy.
Priddy v. Rawson, 282 S.W.3d 588, 599 (Tex. App.--Houston [14th
Dist.] 2009, pet. denied).  "The elements of a breach of
fiduciary duty claim are: (1) a fiduciary relationship between
the plaintiff and defendant, (2) the defendant must have breached
his fiduciary duty to the plaintiff, and (3) the defendant's
breach must result in injury to the plaintiff or benefit to the
defendant." Jones v. Blume, 196 S.W.3d 440, 447 (Tex. App.
--Dallas 2006, pet. denied).

In support of this claim, Energy asserts that:

As the Chief Executive Officer, and Director of
Plaintiffs, Zouvas owed Plaintiffs fiduciary duties of
trust and loyalty. As the Chief Financial Officer,
Allen owed Plaintiffs fiduciary duties of trust and
loyalty. . . . Zouvas and Allen breached these duties
through their inequitable and fraudulent actions in
mismanagement of Plaintiffs by authorizing and

14

directing the Transfers to be made without
authorization from the Board and knowing full well that
Plaintiffs were insolvent and had nothing to gain in
exchange for the Transfers to the Defendants. These
actions caused injury to Plaintiffs and its creditors,
to the benefit of the Defendants.

. . . The misrepresentations and failures to
disclose material information to the ReoStar Board of
directors and shareholders by Zouvas and Allen
prevented ReoStar from being able to assess other
potential buyers offering better deals for the company
and its shareholders. . . .

. . . Zouvas and Allen breached their duties of
care and loyalty owing to the ReoStar Board,
shareholders and creditors. As a proximate result of
Zouvas's and Allen's breaches of fiduciary duty,
ReoStar was blocked from doing any other deal, ReoStar
was prevented from recapitalizing and reorganizing, and
BTMK was able to wrongfully obtain assets at a deep
discount, causing ReoStar to suffer damages in at least
the amount of the Transfers.

Compl. at 39-40, ¶¶ 131-135.

The court thus concludes that the Complaint has pleaded

sufficient allegations to survive a motion to dismiss on this

claim. Accordingly, the court is not dismissing this breach of

fiduciary duty claim as to movants.

C.   The 10th Cause of Action

The 10th cause of action asserts a claim for knowing

participation in breach of fiduciary duty.  When a defendant

knowingly participates in the breach of a fiduciary duty, he

becomes liable as a joint tortfeasor.  Darocy v. Abildtrup, 345

S.W.3d 129, 137 (Tex. App.--Dallas 2011, no pet.). A cause of

action based on a contribution to a breach of fiduciary duty must involve the defendant's knowing participation in such a breach. Id. at 138.  A claim that a defendant knowingly participated in a breach of fiduciary duty by a third party hinges on the existence of a fiduciary duty owed by the third party to the plaintiff. Id.  In addition to the existence of a fiduciary duty, the plaintiff must show the defendant knew of the fiduciary relationship and was aware of his participation in the third party's breach of its duty.   Id.

> In support of its claim, Energy asserts the following:
>
> . . . Defendants improperly utilized Zouvas' power and position to obtain confidential, proprietary information, including but not limited to the value and potential value of [Energy's] assets and the Line of Credit, as well as to persuade the other [Energy] Board members of the benefits of doing a deal with BTMK that was contrary to the best interests of [Energy] and its shareholders. Defendants worked with Zouvas to induce him to breach his fiduciary duty of loyalty and fair dealing to [Energy], and Defendants capitalized on Zouvas' malfeasance and willingness to accommodate BTMK by obtaining assets at a deep discount, to the detriment of [Energy], its shareholders and its creditors.
>
> . . . As a proximate result of Defendants' knowing and conspiratorial participation in Zouvas' breach of fiduciary duty of loyalty, ReoStar was blocked from doing any other deal, ReoStar was prevented from recapitalizing and reorganizing and BTMK was able to wrongfully obtain assets at a deep discount, causing ReoStar to suffer damages in the full amount of the Transfers, plus interest.

See Compl. at 42, ¶¶ 142-43.

The general references to "[d]efendants" could be taken to mean not only that Allen induced Zouvas to breach Zouvas's fiduciary duty, but also that Zouvas induced Allen to breach Allen's fiduciary duty. The allegations are vague on this point, but the court concludes that the Complaint has pleaded sufficient allegations to survive a motion to dismiss on this claim. Thus, the court is not dismissing the claim for knowing participation in breach of fiduciary duty as to movants.

D.   The 11th Cause of Action

The 11th cause of action asserts a claim for negligence. Under Texas law, "[t]he elements of a negligence cause of action are a duty, a breach of that duty, and damages proximately caused by the breach of duty." Doe v. Boys Club of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995) (citations omitted). Proximate cause consists of two components: "cause in fact and foreseeability." Id.

With respect to the negligence claim against movants, Energy alleges:

> . . . Zouvas and Allen owed duties to the
> Plaintiffs as their officers and breached those duties
> based on the allegations set forth herein. As such,
> Zouvas and Allen were negligent in their mismanagement
> of Reostar. As a result, ReoStar was blocked from doing
> any other deal, ReoStar was prevented from
> recapitalizing and reorganizing, and BTMK was able to
> wrongfully obtain assets at a deep discount, causing

17

> ReoStar to suffer damages in at least the full amount
> of the Transfers, plus interest.

See Compl. at 43, ¶ 146.

The court concludes that Energy has pleaded sufficient allegations to survive a motion to dismiss on this claim. Accordingly, the court is not dismissing the negligence claim as to movants.

E.   12th Cause of Action

The court now turns to the 12th cause of action, which asserts a claim for gross negligence.  To establish gross negligence, a plaintiff must also prove by clear and convincing evidence two additional elements: (1) that from the actor's standpoint, the act or omission complained of involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) that the actor had actual subjective awareness of the risk involved but nevertheless proceeded in conscious indifference of the rights and safety or welfare of others. Tex. Civ. Prac. & Rem. Code § 41.003(a)(3); Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex. 2001).

In support of its gross negligence claim, Energy alleges that movants were

> grossly negligent in their mismanagement of Reostar. As
> a result, ReoStar was blocked from doing any other

18

deal, ReoStar was prevented from recapitalizing and
reorganizing, and BTMK was able to wrongfully obtain
assets at a deep discount, causing ReoStar to suffer
damages in at least the full amount of the Transfers,
plus interest. . . .

. . . Defendants' actions were egregious and
injury was a foreseeable consequence of the Defendants'
behavior.

See Compl. at 43, ¶¶ 149-50.

The court has misgivings about the conclusory nature of
these allegations, but the court concludes that Energy has
pleaded sufficient allegations to survive a motion to dismiss on
this claim. Accordingly, the gross negligence claim is not being
dismissed as to movants.

IV.

Conclusion and Order

For the reasons given above, the court has concluded that
the motion to dismiss should be granted as to movants to whatever
extent the 1st, 2nd, and 3rd causes of action are intended to be
directed against movants; and, that the motion should be denied
to whatever extent the 9th, 10th, 11th, and 12th causes of action
were directed against movants.

While the court agrees with movants that much of the
language in the Complaint is improper and superfluous, the court
is choosing not to strike the allegations at this time. Thus, to
the extent that the motion seeks to strike the Complaint for

failing to comply with the pleading standards with respect to form and substance, the motion is being denied.

Finally, the court concludes that Energy should not be afforded an opportunity for leave to amend its pleading yet again.   Therefore, Energy's request to be granted to leave to file an amended complaint is being denied.

Therefore,

The court ORDERS that all claims and causes of action asserted in the 1st, 2nd, and 3rd causes of action alleged in the Complaint (contained in paragraphs 87 through 97 on pages 29 through 33 of the Complaint) be, and are hereby, dismissed with prejudice to whatever extent any of those claims and causes of action are directed against Zouvas or Allen.

The court further ORDERS that the motion to dismiss be, and is hereby, denied as to the 9th, 10th, 11th, and 12th causes of action to whatever extent they are directed against Zouvas and Allen.

The court further ORDERS that the motion to strike the Complaint for failing to comply with the pleading standards be, and is hereby, denied.

The court further ORDERS that Energy's request for leave to file an amended complaint, be, and is hereby, denied.

SIGNED August 3, 2012.

_____
JOHN McBRYDE
United States District Judge